**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

**Welai Grant**
**811 Tipton Road**
**Middle River, MD 21220**

        *Plaintiff*,

**v.**


**Baltimore City Police Department**
**242 W. 29th Street**
**Baltimore, MD 21211**

        *Defendant*.

**Serve:**

**The Baltimore City Law Department**
**Office of Legal Affairs**
**C/O City Hall, Room 101**
**100 N. Holliday St., Suite 101**
**Baltimore, MD 21202**

**Baltimore Police Headquarters**
**601 East Fayette St.**
**Baltimore, MD 21202**

**Case No.:** 21-2173




**JURY TRIAL DEMANDED**


**Dated: August 24, 2021**

<u>**COMPLAINT**</u>

COMES NOW, Plaintiff, Sergeant Welai Grant (hereinafter "Plaintiff" or "Sgt. Grant"),

by and through her undersigned counsel Dionna Maria Lewis, Esq. complains against Defendant,

Baltimore City Police Department (hereinafter "Defendant" or "BPD") and in support thereof

states as follows:

1

## INTRODUCTION

1. This is an action authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq*. ("Title VII") the Civil Rights Act of 1866, Section 1981(a) ("Section 1981"), 42 U.S.C. § 1320d-6 *et seq*., the Americans with Disabilities Act of 1990 42 U.S.C. § 12101 *et seq*. ("ADA"), and the Maryland Fair Employment Practices Act Md. Code § 20-601 *et seq*. (FEPA) for the Defendant's unlawful harassment, discrimination, and hostile work environment based on race (African American), sex (female), retaliation (prior statutorily protected activity) against the Plaintiff.

## JURISDICTION AND VENUE

2. This Honorable Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. §§ 1331 as it asserts a claim that arises under the Constitution, laws, or treaties of the United States, specifically Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., and Section 1981, to redress and enjoin employment practices of the Defendant.

3. This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1343.

4. Venue is appropriate because a substantial part of the actions complained of are the result of actions and employment practices of Defendant, which operates in Baltimore, Maryland.

5. Additionally, venue is proper in the District of Maryland Court pursuant to 28 U.S.C. §§ 1391(b) and (e) because a substantial part of the wrongful conduct complained of herein occurred in this District, Defendant transacts substantial business in this District, and Defendant maintains employment records related to this action in the District of Maryland.

## EXHAUSTION OF REMEDIES

6.  Plaintiff has exhausted all of her administrative remedies.

7.  Plaintiff filed an initial charge with the Baltimore Field Office of the U.S. Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on race (African American), sex (female), and retaliation (prior statutorily protected activity), and received her Right to Sue letter on May 26, 2021.

8.  Plaintiff filed an additional charge with the Baltimore Field Office of the U.S. Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on race (African American), sex (female), and retaliation (prior statutorily protected activity), in EEOC No. 531-2021-02348 and received her Right to Sue letter on August 19, 2021.

9.  Accordingly, Plaintiff timely files this action in accordance with the Notice of Rights, which provided Plaintiff the right to file this Complaint for claims raised with the EEOC, pursuant to her receipt of both Right to Sue letters, within 90 days of receipt of the Notice.

## NATURE OF THE ACTION

10. Plaintiff brings this action to secure protection of rights granted under the statutes mentioned above, to redress deprivation of rights thereunder, and to obtain such other relief as is necessary to redress the injury to Plaintiff resulting from Defendant's violation of those statutes.

11. Plaintiff's damages are significant, including, but not limited to, the loss of reputation, career advantage, emotional tranquility, and denial of her constitutional and statutory rights.

12. The action seeks declaratory and injunctive relief, as well as compensatory and punitive damages, both to secure future protection and to redress the past deprivation of rights guaranteed to named Plaintiff.

## PARTIES

13. Plaintiff, Sergeant Welai Grant, is an African American female who resides in Baltimore County.

14. Defendant is a municipal police force, whose jurisdiction encompasses Baltimore, Maryland, the State's largest city.

15. The Baltimore Police Department ("Defendant" or "BPD") is the 8th largest municipal police force in the United States, staffed by nearly 3,100 civilian and sworn personnel. The Department's jurisdiction covers Maryland's largest city, with a population of approximately 611,648 people.

16. During the relevant period, Defendant employed Plaintiff, Sgt. Welai Grant.

17. During the relevant period, Plaintiff was Defendant's employee within the meaning of Title VII, and thus entitled to the protections of Title VII.

## FACTUAL ALLEGATIONS

18. Plaintiff, Sgt. Welai Grant, has been employed by Defendant, the Baltimore Police Department ("BPD") since June 23, 2008 until present, as a Police Sergeant.

19. On or around August 2018, Plaintiff was assigned to the Recruitment Section of the Department. During her time in this unit, the Plaintiff consistently received excellent performance evaluations, with no disciplinary issues or other personnel infractions.

20. On or around September 2018, the Plaintiff authored an administrative report that detailed a complaint she had received from a City Hall employee. The complaint and the

4

administrative report described unethical and violative behavior demonstrated by Major Handley (White, male). As a result of this report and other allegations that developed, Major Handley was investigated by the Internal Affairs Ethics Unit. Major Hance then reviewed the administrative report and collected it to be sent up the chain of command for their review. The report was distributed to Lieutenant Colonel Barillaro, Lieutenant Colonel LaTonya Lewis, and then Chief of Staff, James Gillis. The Ethics Unit of the Internal Affairs Department then began its investigation into the accusations alleged in the report. During their investigation, they discovered that Major James Handley had inappropriate sexual relations with an applicant while he was the Major of Recruitment, misappropriated funds while attending a recruitment event in Puerto Rico, and that he had discriminatorily disqualified five (5) African Americans from the application process.

21. On or around October 2018, Major Handley, who had just been alerted about the Internal Affairs investigation against him, ordered Plaintiff into his office for questioning. Major Handley demanded to know details regarding the complaint, such as who lodged it, what were its contents, etc. In order to protect the complainant and the process, Plaintiff declined to answer any questions related to the administrative report. In response, Major Handley attempted to intimidate and threaten Plaintiff by stating he "has friends in high places" and "he knows what is going on and just wanted to see if [the Plaintiff] would tell him anything." Major Handley also informed the Plaintiff that he is very close with James Gillis, and that the investigation into these allegations is "all bullshit" and that everyone involved in his inception will "get theirs."

22. On or around March 2019, while visiting the Recruitment floor, James Gillis told Lieutenant Colonel Barillaro that Major Hance is a "fucking idiot" and is not very

intelligent. He also asked Lieutenant Colonel Barrilaro to "find me something that gives me a reason to get him out of here so that I can put another person here that will be competent because he is a fucking moron." Under that order, Major Handley, Sergeant Giannakoulias, (White, male) and Detective Edmanuel Rivera together fabricated a story that alleged Major Hance showed favoritism to a specific applicant. As a result, Major Hance was involuntarily transferred from the Recruitment Section and then demoted prior to the start of an investigation by BPD. In reality, the alleged accusations were investigated and found to be unsubstantiated, yet Major Hance was still demoted prior to the completion of a thorough investigation. Lieutenant Colonel Barillaro was also demoted to Major and replaced Major Hance in the Recruitment Section and Lieutenant Colonel LaTonya Lewis was demoted to a Major. Based on reason and belief,all of these personnel demotions were effectuated in retaliation for their involvement in the investigation of Major Handley. From that point forward, the retaliatory behavior of James Gillis worsened, as he then began making derogatory remarks to Major Barrilaro, prompting Major Barilaro to caution Plaintiff about impending retaliation in relation to her involvement in the Handley investigation. More specifically, Major Brian Hance warned Plaintiff to "watch herself" because James Gillis was determined to retaliate against every person that was involved in the "Major Handley investigation" and that everyone who had a part in reporting the administrative report against Major  Handley had thus far been demoted.

23. On or around April 2019, Major Handley took possession of applicant Martez Carter's employment folder for unknown reasons. Since Major Handley was not assigned to Recruitment, it was highly unusual and against protocol for him to have possession of this folder. Plaintiff became aware of this violation of protocol and informed Chanel Bastfield

of this concern, leading Ms. Bastfield to contact James Gillis. Despite protocols in place to deny access of an applicant's folder to Major Handley and anyone else not assigned to Recruitment, Mr. Gillis replied that he had given Major Handley permission to take possession of the employment folder and hold onto it.

24. Martez Carter's employment folder contains several pieces of personal information that could be used against him in the wrong hands, so this unauthorized access of an applicant's personnel file was very problematic.

25. On or around May 2019, Major Barillaro was demoted to Lieutenant and removed entirely from the Recruitment Section. Lieutenant Barillaro asserted to Plaintiff that she was demoted due to retaliation and "not being a participant in Gillis's game." Yet, Major Handley was re-instated as the Acting Major of Recruitment, despite the numerous outstanding complaints of misconduct that were still being investigated against him from his previous tenure as the Major of Recruitment in 2017. Plaintiff initiated one of the complaints reporting allegations of misconduct by Major Handley for taking kickbacks under his command. Thusm therefore Major Handley's placement in the Recruitment Section put Plaintiff in direct line of harm of retaliation and reprisal, since she would have to report directly to him.

26. On or around June 2019, after Plaintiff returned to work from approved medical leave of absence she was cautiously warned by Lieutenant Amey thatMajor Handley was targeting her and that he had been ordered to send Plaintiff an email about her use of medical leave, even though Lieutenant Amey did not believe this outreach was necessary. This was a tactic to harass and bully Plaintiff into not using her earned medical leave, and in turn, place her in a state of fear of Major Handley.

27. On or around July 2019, Major Handley was permanently reassigned to the Recruitment Section.

28. On or around July 2019, Major Handley ordered Plaintiff into his office. Major Handley then told Plaintiff, "We could be the best of friends if you could learn to shut the fuck up and mind your own fucking business." He continued his beratement, stating, "I know that cocksucker DeSousa brought you and Major Hance to Recruitment to spy on me and find dirt on me! Well look where that son of a bitch is now, in jail!" Major Handley then continued by reiterating that he would retaliate against anyone that made a statement against him and that Deputy Commissioner Gillis will support his every move.

29. On or around August 1, 2019, Plaintiff witnessed Major James Handley call Department applicant, Martez Carter, a "fucking nigger." Major Handley was on speakerphone with the applicant so every person in the office could hear his conversation. Immediately after the call concluded, Plaintiff gathered all the detectives into the office to ask who had heard the conversation. Ron Carter and Dorian Salmon both confirmed hearing the conversation. Ron Carter said he heard Major Handley use a racial epithet towards an applicant and Dorian Salmon confirmed that both Sergeants George Giannakoulias and Regina Richardson were not in the office for the duration of the phone call with applicant Carter. Plaintiff concluded this brief meeting and then immediately went to the Inspector General's Office to file a formal complaint. Plaintiff chose this office because she believed that they would conduct an impartial investigation that was outside of Major Handley's control. The IG's office assured Plaintiff that the complaint would be kept confidential and that they would conduct a thorough investigation.

30. On or around August 6, 2019, Investigator Michelle Phillips of the Inspector General's Office called Plaintiff. Investigator Phillips informed her that she had notified her supervisor, Inspector General Isabella Cummings, and another male deputy within that office that the IGO has received alarming complaints against Deputy Commissioner Gillis that needs to be investigated. As Cummings and the male deputy were known friends of Deputy Commissioner Gillis, Plaintiff became concerned that her complaint would be distributed and anticipated  furtherretaliation. Ms. Phillips assured Plaintiff that the information in the complaint would remain confidential and that the Department would not be contacted until the investigation concluded. Up to this point, Plaintiff had filed three (3) separate complaints to the IGO, none of which were formally investigated, but all of them were ironically leaked to Deputy Commissioner Gillis.

31. On or around August 7, 2019, Plaintiff received an email from Deputy Commissioner Gillis instructing her to report to his office to discuss the Stats for the Recruitment Unit. At the beginning of the meeting, Deputy Commissioner Gillis commended Plaintiff for her hard work and accomplishments in the Recruitment Unit, including providing accurate Stat reports. He then informed Plaintiff that he heard she witnessed Major Handley use a racial epithet towards an applicant. Plaintiff responded that she did not feel comfortable discussing this subject. Deputy Commissioner Gillis forewarned, "very well, I think that is smart and if anyone else asks you about it you should say the same thing or that you do not remember."

32. Then, Police Commissioner Michael Harrison entered Deputy Commissioner Gillis' office, to which Deputy Commissioner Gillis exited, leaving Plaintiff and Commissioner Harrison alone. Plaintiff greeted Commissioner Harrison, to which Commissioner Harrison replied,

"This meeting is to discuss Major Handley." Plaintiff responded that she did not feel comfortable speaking about Major Handley, and when prompted why, Plaintiff stated that the close relationship between Deputy Commissioner Gillis and Major Handley concerned her as she feared being a target for retaliation. Commissioner Harrison replied that he would not allow that to happen, and that is why he asked Deputy Commissioner Gillis to step out so that he and Plaintiff could talk privately.

33. Commissioner Harrison continued by stating that Major Handley was temporarily assigned to the Recruitment Unit while they search for a permanent replacement, and that he is in the process of developing a selection process policy that is inclusive of an anti-retaliation policy. Commissioner Harrison further stated to Plaintiff that he is against the current Department policy that permitted members to be usurped for promotion and transfer opportunities because of personal bias or retaliation. Plaintiff then asked Commissioner Harrison how Major Handley was reassigned to the Recruitment Unit after being removed due to the numerous complaints and allegations. Commissioner Harrison replied that he was not aware of Plaintiff's complaint until he received a phone call from City Hall— where the IGO and Mayor's Office is located—but did not specify who the call was from; he then asked Plaintiff if she had made a complaint with the IGO. Plaintiff affirmed that she had, and that she had chosen that route to avoid retaliation from Deputy Commissioner Gillis.

34. Plaintiff informed Commissioner Harrison that she was aware Deputy Commissioner Gillis had received the complaints despite her efforts to keep them anonymous. Commissioner Harrison commented that he was aware of Deputy Commission Gillis' close relationship with Major Handley, again referencing why he excused him from the meeting. Plaintiff

requested to keep their conversation confidential as she lacked faith that Deputy Commissioner Gillis could remain neutral regarding Major Handley.

35. Commissioner Harrison concluded the meeting by gaslighting Plaintiff, telling her that she is imagining these incidents, and cryptically threatened, "bad things will happen if [she] speaks up and reports corruption." *"It's ok to see the coffin but don't see yourself in the coffin"* Plaintiff asked what he meant, and Police Commissioner Harrison said, *"Its ok to see bad stuff happen to people but don't see the bad stuff happening to you! You're imagining all of the bad things that will happen to you if you speak up and report corruption."* He closed with a final chastise, "learn to blow this stuff off without letting it affect you, work on that!"

36. Two weeks after this meeting, Major Handley became increasingly antagonistic towards Plaintiff making passive aggressive comments to her in meetings and in passing. During this same time period, Contractual Specialist Ron Carter informed Plaintiff that he overheard Major Handley and Sergeant Giannakoulias discussing the former Department applicant, Martez Carter. In that conversation, Major Handley profiled Ron and Martez saying that "[that] thug [Contract Specialist Carter] outside the door knew Martez Carter because they look alike and share the same last name." Major Handley also made remarks about Plaintiff, stating that "this little, short bitch is getting herself involved in shit that has nothing to do with her" and more menacingly, "[he] refuses to let a little short bitch tell [him] what to do."

37. Upon information and belief, Plaintiff believed that she was the "little, short bitch" Major Handley and Sergeant Giannakoulias were referring to due to her previous complaints, the suspicious timing in relation to her conversation Commissioner Harrison and because of a

preceding conversation with Major Handley in which Plaintiff advocated for Martez Carter being hired because he was qualified for the position. Major Handley strongly disagreed, dismissing Plaintiff for expressing her professional opinion, and then ordering her to "get the fuck out of [his] office."

38. On or around August 14, 2019, Plaintiff was approached by Sergeant Regina Richardson. Sergeant Richardson, without solicitation, informed Plaintiff that Martez Carter was fabricating his story about Major Handley. She claimed to know this to be true because Sergeant Richardson and Sergeant Giannakoulias were in the office and did not hear Major Handley make any racial remarks. Plaintiff refreshed Sergeant Richardson's memory that while he had been in the office that day, it was not at the time of the incident. Sergeant Richardson then became belligerent and aggressive, ordering Plaintiff to "mind [her] own business." Plaintiff informed Sergeant Richardson that she intended to continue to tell the truth to Internal Affairs despite these numerous pressures, retaliatory acts, and threats for her to be dishonest.

39. On or around the evening of August 14, 2019, Plaintiff sent an email to Sergeant Regina Richardson that detailed unlawful and inappropriate behavior of Major Handley that she personally witnessed. Sergeant Richardson forwarded that email to Chanel Bastfield and Deputy Commissioner Gillis, the latter who forwarded it to the Innovation Team – the entity that controls the Recruitment Unit.

40. On or around August 2019, Plaintiff applied for a position in the Homicide Unit but did not receive a transfer offer. Shortly thereafter, Plaintiff learned that Sergeant Kevin Brown was boasting about his ability to ensure that Plaintiff would not be selected for that position due to her previous complaints against Major Handley. Additionally, /around this time,

Sergeant Richardson began physically and socially harassing Plaintiff, including an incident in which Sergeant Richardson attempted to violently hit Plaintiff with her bag while exiting the elevator. Plaintiff filed an Internal Affairs case against Sergeant Regina Richardson and Sergeant Kevin Brown for harassment, retaliation, and professional misconduct after preventing her from being considered for a position she applied for, and was qualified for, in the Homicide Unit.

41. On or around October 3, 2019, Plaintiff was contacted by the Public Integrity Bureau and ordered to report to their office to retrieve paperwork. Upon her arrival, Plaintiff was informed that an investigation had been initiated against her regarding an email that she sent to Sergeant Regina Richardson. The email in question was written by Plaintiff and detailed another inappropriate incident regarding Major Handley that she had witnessed.

42. On or around January 16, 2020, Plaintiff attended a meeting to address the investigation initiated against her for the email she sent to Sgt. Richardson. Plaintiff provided a recorded statement that explained the contents and perspective of the email. Without any regard to the context or reasoning for the email, the Department questioned her thoroughly with great concern over one specific sentence of the email that stated, "You are a white woman trapped in a black woman's body." The Department did not consider nor address the remainder of the email that detailed the egregious and unlawful violations committed by Major Handley, as well as Sergeant Richardson's conduct of repeatedly dismissing these concerns.

43. On or around January 16, 2020, Plaintiff was ordered by Internal Affairs to provide a statement regarding the complaint she filed against Major Handley for using a racial epithet towards an applicant. During this procedure, Plaintiff was informed that Sergeant

13

Richardson and Major Handley had fabricated a story that she and the applicant, Martez Carter, had a friendship prior to his application submission to the Department. This false narrative alleged that Plaintiff and Carter were longtime friends, and that they worked together to submit a fictitious allegation against Major Handley to remove him from the Recruitment Unit. Plaintiff was baffled upon hearing this information, and immediately advised the investigator that this story is untrue and was conjured to impeach her credibility as a witness.

44. Plaintiff further explained that because she was the Sergeant in charge of overseeing the background investigation of Mr. Carter, she had become acquainted with him but that is the extent of their relationship. Later, it was confirmed that Sergeant Richardson and Major Handley's narrative was indeed false after the investigator subpoenaed Plaintiff's phone records. Her phone records supported her assertion that she had never been in contact with Mr. Carter prior to the incident, and the investigation correctly deduced that they were not prior longtime friends. Other witnesses were also interviewed regarding this complaint and their testimonies supported Plaintiff's allegations. Internal Affairs found that the allegations against Major Handley were valid, and they sustained the case. Major Handley retired shortly after these findings and was never formally reprimanded. Deputy Commissioner Gillis then attempted to award a Letter of Good Standing for Major Handley despite having a sustained case on his record at the time of retirement.

45. On or around July 30, 2020, Sergeant Richardson's case against Plaintiff was sustained. The punishment proposed a fifteen (15) day suspension without pay, the issuance of a severe Letter of Reprimand, and a mandatory workplace violence training seminar. Plaintiff considered whether the acceptance of the punishment would affect her ability to

qualify for a promotion, as she scored number five (5) on the civil service promotional exam. When questioned about this, Deputy Commissioner Nadeau assured Plaintiff's then-attorney, Michael Davey, that it would not affect her promotional opportunities. Deputy Commissioner also stated to Mr. Davey that Plaintiff should take the proposed punishment because if "a white officer had sent that email they would have been fired."

46. Plaintiff relied upon these assurances in deciding to not contest the punishment.

47. On or around September 6, 2020, Plaintiff was contacted by the Deputy Director of Recruitment, Chanel Bastfield. Ms. Bastfield informed Plaintiff that she was being transferred to another unit within the Baltimore Police Department but declined to provide any further details for the transfer. This was done despite Department policy mandating an explaination of the rationale for the transfer as well as providing the officer an opportunity to challenge the transfer if it extends beyond thirty (30) days. Plaintiff was then transferred to the Special Events Unit under the Patrol Division. After Plaintiff was transferred, her previous position was permanently filled by Sergeant Regina Richardson on the orders of Major Handley. This also violated Department policy by permanently fill a position for a temporary transfer.

48. On or around December 2020, Plaintiff was meeting with her direct supervisor, Major Corbett. He informed Plaintiff that prior to her transfer to the Special Events Unit, he had received a call from Deputy Commissioner Gillis advising him to be wary of Plaintiff. Deputy Commissioner Gillis ordered Major Corbett to closely observe Plaintiff, document her every move, and intentionally make her uncomfortable by reprimanding her for any infraction. Major Corbett continued that after that call, whenever he saw Deputy Commissioner Gillis, he would ask whether Plaintiff had yet committed any violations that

could substantiate a charge against her. Each time Major Corbett explained that there was not, and that Plaintiff was a great employee.

49. On or around June 8, 2021, Plaintiff was summoned to attend a meeting with Deputy Commissioner Briscoe. The attendees of this meeting included Plaintiff, Deputy Commissioner Briscoe, and four (4) command staff members. Deputy Commissioner Briscoe began the meeting by informing Plaintiff that she would not be promoted.

50. Further, during this June 8, 2021 meeting, Plaintiff was advised that due to Draft Policy 1721, Plaintiff would need to retest in order to become eligible for a promotion. This was not an actual or active policy of BPD, as it was still noted as "Draft." Thus, Plaintiff was being denied a promotion pursuant to a draft policy.

51. Deputy Commissioner Briscoe then informed Plaintiff that Sergeant Richardson's case against her was the cause for the delay. Plaintiff, astonished, replied that she had accepted the punishment in that matter, and was assured that it would not affect her promotional ability. Deputy Commissioner Briscoe then followed up by stating that this is a "byproduct of that incident" effectively demonstrating that the Department was layering punishments against Plaintiff for the same incident.

52. At the time of this meeting, Draft Policy 1721 had not yet been approved by the Department of Justice, the Baltimore Community, or Police Commissioner Harrison; therefore, it was unenforceable. Still, the Department used this Draft Policy as a barrier to prevent Plaintiff from being rightfully promoted to a position that she has earned.

53. On or around June 11, 2021, Plaintiff contacted Baltimore Police Department's Equity Officer Bill Joyner to discuss this issue. Mr. Joyner then scheduled a meeting. Plaintiff attended, and her attorney was conferenced in. During this meeting, Plaintiff expressed all

the aforementioned concerns, as well as the fact that the members of the Promotional Committee all had a negative perception of the Plaintiff based on false assertions, particularly those articulated by Deputy Commissioner Gillis and Chief of Legal Lisa Conic-Walden. Plaintiff also relayed that she had requested a recusal of those conflicted members but was denied.

54. Plaintiff requested to review the notes from the Promotional Committee so that she could review areas that she could improve. She was denied this opportunity, even though it is against public policy to allow candidates to review the reasonings for eligibility or ineligibility. Mr. Joyner replied that Plaintiff was denied the promotion because the Promotional Committee did not believe she was qualified to be commander, and that she had been denied after not meeting the qualifications of the Draft Policy. Plaintiff reiterated her concern that this pretext was not the actual reason for her being passed over, as she in good faith believes this was an act of retaliation responding to her previous protected activity regarding Major Handley's misconduct. Mr. Joyner informed Plaintiff that he would conduct an independent investigation into the additional information she submitted and would be in touch soon.

55. On or around June 24, 2021, Plaintiff officially accepted the proposed punishment for Sergeant Richardson's sustained case against her.

56. On or around June 25, 2021, Plaintiff had a follow up conversation with Mr. Joyner regarding the status of his independent investigation. Mr. Joyner informed Plaintiff that he was still researching the additional information she had provided regarding disparate treatment. Plaintiff then inquired about the recusal process in regard to her being considered for the next available position. Additionally, Plaintiff asked if Mr. Joyner had

reviewed the disciplinary records relating to Plaintiff and he replied that he was aggregating the reports dating back one year. Since this behavior began long before that, Plaintiff recommended Mr. Joyner look at reports beginning around five (5) years ago for him to truly see the pattern of disparate and discriminatory treatment against minority officers. Mr. Joyner promised that he would pull reports from the past two years, and that he will follow up with Plaintiff in a few weeks.

57. On or around June 29, 2021, Plaintiff received an Absent Without Leave ("AWOL") notice for not attending her shift at an Orioles baseball game. She was not scheduled to work.

58. In April 2021, Plaintiff had met with Lieutenant Reinhard (White, male) to discuss tentative dates that Plaintiff was available to work as a detail for six (6) games during the 2021 MLB season. Plaintiff selected the following dates: July 24, August 7, August 21, September 11, September 25, and September 30. On June 20 at 11:46 a.m. the Plaintiff received a text message from Lieutenant Reinhard informing her that she was scheduled to work the Orioles game that started at 11:00 a.m. that day. Plaintiff then immediately called Lieutenant Reinhard and informed him that she was not scheduled to work this game, and that she was unavailable as she was in New York visiting her family. Plaintiff even offered to reschedule or switch this shift with someone else, if necessary.

59. It was later discovered that Sergeant Atwood (White, male) was scheduled to work on June 19 and June 20, but was approved for vacation leave, without any confirmation of his work schedule. Sergeant Atwood did not report to work for his scheduled shift and received no reprimand for this unexcused absence. Instead, Lieutenant Reinhard found a replacement and paid them over-time to fill the position for Sergeant Atwood for the game on June 19, 2021.

60. Lieutenant Reinhard then looked upon Plaintiff to fill the vacancy for the game on June 20, 2021, even though this scheduling error was in no way caused by her. In response to her not being able to substitute for Sergeant Atwood on short notice, the Department issued Plaintiff an AWOL charge. Plaintiff learned that Lieutenant Reinhard unrightfully cancelled her regular scheduled day off without providing prior notice to Plaintiff pursuant to BPD Policy 316- Mandatory Appearances. Plaintiff has never received an AWOL charge during her entire tenure with the Department.

61. On or around July 19, 2021, Plaintiff was denied a transfer opportunity and it was clear that she was being "blackballed" and further retaliated against.

62. On or around, August 10, 2021, Major Corbett called Plaintiff requesting a meeting in the EOC room in reference to planning of the AFRAM. Upon her arrival, to Major Corbett's office, Plaintiff found Lt. Reinhard present. Plaintiff declined to have a seat and Major Corbett and Lieutenant Reinhard shared disapproving looks in response.

63. As previously pled, Plaintiff had on several occasions been called to a superior's office for a legitimate purpose only to find herself being provoked about unrelated issues. As such, Plaintiff braced for what she felt was inevitable provocation.

64. The planning details were discussed, and Major Corbett then inquired whether Plaintiff was "Okay." Plaintiff calmly explained that she was not and that she was tired of being targeted and mistreated by their unit. She expressed how she received regular phone calls about members within her unit discussing her status with members outside their unit and how the combined stress of this work environment was deeply impacting her physical and mental health. Major Corbett attempted to then redirect Plaintiff to the work at hand. After

Plaintiff reiterated her concern for her mental health due to the toxicity of her work environment, Major Corbett coldly reaffirmed that the work must be done.

65. Subsequently, on August 10, 2021, Plaintiff was ordered to take a Fitness for Duty Examination, without justification.

66. Plaintiff then advised Major Corbett that she was going to be out on medical effective August 11, 2021, as her work environment was not conducive to work. She described how her interactions with Major Corbett and Lieutenant Reinhard hade made her depressed and constantly anxious. Plaintiff attempted to excuse herself from this meeting to retain her composure and professionalism, but Major Corbett protested that the meeting could not be curtailed.

67. While this meeting was not hostile in nature, the environment in which Plaintiff worked made interactions such as this increasingly likely to produce stress and anxieties regarding reprisal or discipline, that could befall her at any moment.

68. Plaintiff detailed the events of August 10, 2021, in a report to Captain Frederick Stewart revealing private and potentially embarrassing medical details. She did this with the express purpose of alerting her Captain to her being constantly targeted by Major Corbett and that she remained in fear of further discipline from Major Corbett for insubordination because of her defiant stance of requesting to be excused from a meeting to prevent a mental breakdown.

69. On or around August 15, 2021, Plaintiff was again denied another transfer opportunity and it was clear that she was still being "blackballed" and further retaliated against for her prior statutorily-protected activity.

70. Plaintiff has been unlawfully deterred from pursuing or receiving internal promotions due to the inaccurate and unlawful AWOL investigation that was opened against her on a scheduled off day.

71. Plaintiff has been unlawfully deterred from pursuing or receiving internal promotions as she has faced a barrage of harassing complaints that has prevented her record from accurately reflecting her achievements.

72. Plaintiff was forced to file suit due to the Defendant's inability to remedy their unlawful conduct against Plaintiff which has cost her significant emotional distress and financial strain.

73. The Defendant's discriminatory and retaliatory practices have been effectuated in violation of both Title VII of the Civil Rights Act and Section 1981.

## <u>COUNT I</u>

### **VIOLATION OF TITLE VII - RACE DISCRIMINATION**

74. Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

75. A prima facie case of race discrimination requires a showing of four (4) elements: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination.

76. Here, the four (4) elements of a *prima facie* case of race discrimination are met. The Plaintiff is African American, a woman, and is considered a member of a protected class as stipulated under Title VII of the Civil Rights Act of 1964. Additionally, Plaintiff is a qualified police officer, as she has approximately thirteen years on the force and maintained

the title of Sergeant. The Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964, when she was harassed by Deputy Commissioner James Gillis and Major Handley of the Baltimore Police Department for submitting a claim against Major Handley for misconduct. Lastly, the above-mentioned harassment by Deputy Commissioner Gillis and Major Handley towards the Plaintiff gives an inference of race discrimination and prejudice.

77. Plaintiff is a member of a protected class as an African American.

78. Because of her race, Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint in violation of Title VII.

79. Defendants' foregoing unlawful adverse actions materially affected the terms, privileges, and conditions of Plaintiff's employment.

80. Defendant knew that Plaintiff was African American prior to the adverse actions described throughout the Complaint and was aware, or should have been aware, of the discrimination Plaintiff was subjected to because of her race.

81. Plaintiff has been treated differently and subjected to different terms and conditions of her employment due to her race.

82. Defendant had limited and reprimanded Plaintiff in a way that deprived her of workplace safety and otherwise adversely affected her status as an employee because of her race.

83. Other employees who were similarly situated, but were non-Hispanic or Caucasian individuals, which is different from the Plaintiff, have been treated more favorably than the Plaintiff with regards to the terms and conditions of employment and workplace conditions.

84. Plaintiff's race was a determining factor in Defendant's unlawful conduct toward Plaintiff.

85. Plaintiff's race was a motivating factor in Defendant's unlawful conduct toward Plaintiff.

86. The Plaintiff faced discrimination when she was intimidated and threatened for participating in statutorily protected activity, as well as being denied an earned promotion after  previously advisement that she was qualified for such.

87. The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

88. Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of her race.

89. Defendant discriminated against Plaintiff because of her race by engaging in, tolerating, or failing to prevent race discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff.

90. Defendant is directly liable for the discriminatory acts or omissions of its agents, servants, and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

91. As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages – including, but not limited to, past and future loss of income, benefits, career opportunities, medical expenses, and costs – and is entitled to all available legal and equitable remedies.

92. Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and her injury is permanent in nature, as of the date of this filing requiring her to seek medical leave.

93. Further, Defendant's treatment and actions are ongoing.

94. Plaintiff has incurred lost wages, loss of reputation, defamation of character, and loss of career opportunity now and into the future, and all of the other losses stated with Plaintiff not contributing in any way thereto.

95. Similarly, situated non-Hispanic Caucasian employees were not subjected to the same, similar, or any adverse treatment as Plaintiff.

96. Baltimore City Police Department must comply with Title VII, but by and through their conduct, have violated Title VII.

<u>**COUNT II**</u>

**VIOLATION OF TITLE VII – SEX DISCRIMINATION (GENDER)**

97. Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

98. A prima facie case of sex discrimination requires a showing of four (4) elements: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination.

99. Here, the four (4) elements of a *prima facie* case of sex discrimination are met. The Plaintiff is African American, a woman, and is considered a member of a protected class. The Plaintiff is a qualified police officer, as she has approximately thirteen years on the force and maintained the title of Sergeant. The Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII while working under the command of Deputy Commissioner James Gillis and Major Handley, where she was subjected to ongoing sexual harassment, including but not limited to, highly inappropriate and offensive sexual comments such as Major Handley referring

to her as the "little, short bitch". The Plaintiff faced discrimination when she was intimidated and threatened for participating in statutorily-protected activity, as well as being denied an earned promotion that she was previously informed she was qualified for. The above-mentioned actions by the Defendants towards the Plaintiff demonstrates the discriminatory and prejudicial manner in which the Defendants treated the Plaintiff and her lawful claims against them.

100.     Defendant treated Plaintiff less favorably than similarly situated male employees.

101.     Because of her sex, Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint under Title VII.

102.     Defendant's foregoing unlawful adverse actions materially affected the terms, privileges, and conditions of Plaintiff's employment.

103.     Defendant knew that Plaintiff was a woman prior to the adverse actions described throughout the Complaint and was aware, or should have been aware, of the discrimination Plaintiff was subjected to because of her sex.

104.     Plaintiff has been treated differently and subjected to different terms and conditions of her employment due to her sex.

105.     Defendant has limited, segregated, and classified Plaintiff in a way that deprived her of employment opportunities and otherwise adversely affected her status as an employee because of her sex.

106.     Other employees who were similarly situated, but members of a class (men) different than Plaintiff, have been treated more favorably than Plaintiff in the terms and conditions of employment.

107.     Plaintiff's sex was a determining factor in Defendant's unlawful conduct toward Plaintiff.

108.     Plaintiff's sex was a motivating factor in Defendant's unlawful conduct toward Plaintiff.

109.     The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

110.     Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her sex.

111.     Defendant discriminated against Plaintiff because of her sex by engaging in, tolerating or failing to prevent sex discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff.

112.     Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

113.     As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary damages – including but not limited to past and future loss of income, benefits, career opportunities, medical expenses and costs – and is entitled to all available legal and equitable remedies.

114.     Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and her injury is permanent in nature.

115.     Further, Defendant's treatment and actions are ongoing.

116.     Plaintiff has incurred lost wages, loss of reputation now and into the future, and all of the other losses stated with Plaintiff not contributing in any way thereto.

## COUNT III

**VIOLATION OF TITLE VII – HOSTILE WORK ENVIRONMENT**

117.     Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

118.     When a hostile work environment is alleged to have occurred as a result of unlawful discrimination, the Complainant must show that: (1) she belongs to a statutorily protected class; (2) she was subjected to harassment in the form of unwelcome verbal or physical conduct; (3) the harassment complained of was based on her statutorily protected class; (4) the harassment affected a term or condition of employment[1] and/or had the purpose or effect of unreasonably interfering with the work environment and/or creating an intimidating, hostile, or offensive work environment; and (5) there is a basis for imputing liability. *See Henson v. City of Dundee*, 682 F.2d 897 (11th Cir. 1982); *Humphrey v. United States Postal Service*, EEOC Appeal No, 01965238 (October 16, 1998); *Harris v. Forklift Systems, Inc.*, 510 U.S. at 21 (1993).

119.     Here, the five (5) elements of a *prima facie* case of a hostile work environment are met. The Plaintiff belongs to a statutorily protected class as African American, and a woman. The Plaintiff was subjected to harassment in the form of unlawful and inappropriate misconduct, threats, and intimidation in an effort to pressure her into withdrawing her complaint against Major Handley, and in retaliation for not doing so after.

---

[1] The phrase "terms, conditions and privileges of employment" in Title VII is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with racial discrimination (or retaliation). One can readily envision working environment so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of group of workers. *Rogers v. EEOC*, 454 F.2d 234 (1971).

Furthermore, Major Handley and Deputy Commissioner Gillis would often make false statements about Plaintiff to other members of the Baltimore Police Department, including that Plaintiff could not be trusted because of her past history of making complaints against other officers, in a reckless effort (due to the nature of their employment) to alienate Plaintiff from her colleagues. This harassment affected several terms and conditions of the Plaintiff's employment, namely where the Plaintiff was severely negatively impacted by Major Handley's conduct. There is a basis for imputing liability, where Major Handley, as well as Deputy Commissioner Gillis, acting on the Defendant's behalf, and Major Corbett and Lieutenant Reinhard acting on Deputy Commissioner Gillis's behalf, subjected the Plaintiff to the above-mentioned harassment, because of her statutorily protected class as an African American woman.

120.    The actions and conduct of the Defendant as set forth herein created a hostile, offensive, and intimidating work environment that detrimentally affected Plaintiff to the brink of a mental breakdown, requiring her to take medical leave to prevent further harm.

121.    The actions and conduct by the Defendant as set forth herein were severe, hostile, and pervasive and constituted discrimination based on sex and race.

122.    The actions and conduct described herein would have detrimentally affected a reasonable person of the same sex and race in Plaintiff's position.

123.    Defendant knew or should have known of the hostile work environment described herein. Defendant has failed to address the problems and further failed to implement effective and appropriate measures to stop the hostile work environment.

124.    By failing to protect Plaintiff within the Department; and by allowing for Caucasian male employees to receive more favorable treatment than Plaintiff in the terms and

28

conditions of employment, Defendant exacerbated the hostile work environment suffered by Plaintiff, and intentionally discriminated against Plaintiff in violation of Title VII.

125.    Defendant's actions, and failure to act, amounted to discrimination based on race and sex under Title VII and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The Equal Protection Clause of the Fourteenth Amendment abrogates the states' Eleventh Amendment sovereign immunity. Title VII, through the 1972 amendment known as the Equal Employment Opportunity Act ("EEOA"), provides an enforcement remedy for equal protection violations of state employees through Section 5 of the Fourteenth Amendment.

126.    As a direct result of Defendant's above-mentioned unlawful acts, Plaintiff has suffered damages, including but not limited to lost wages and emotional and mental distress.

## COUNT IV

## VIOLATION OF TITLE VII – RETALIATION

127.    Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

128.    Title VII of the Civil Rights Act prohibits an employer from "discriminat[ing] against any individual with respect to [his] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e–2(a)(1), and from retaliating against employees for engaging in activity protected by Title VII, *id.* § 2000e–3(a). To that end, an employer may not create or condone a hostile or abusive work environment that is discriminatory. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64–65 (1986).

129.     Here, the Plaintiff faced retaliation for the complaint she submitted against Major Handley where Major Handley was heard referring to a Department applicant as a "fucking nigger." More specifically, once Major Handley and Deputy Commissioner Gillis became aware of this complaint, they actively and intentionally made it their mission to retaliate and intimidate Plaintiff in every way possible. Major Handley often casually made false statements about Plaintiff's trustworthiness to other officers in the unit in an effort to alienate the Plaintiff from her colleagues and undermine her credibility. Major Handley's reckless behavior could endanger Plaintiff's life, serving to further intimidate her. Plaintiff also faced retaliation when she applied for a promotion that she was told she qualified for and was then denied because of Deputy Commissioner Gillis' position on the Selection Committee and his intention on preventing her from succeeding within the Department.

130.     Defendant subjected Plaintiff to the aforementioned adverse employment actions because of her opposition to the unlawful and discriminatory employment practices of Defendant in violation of Title VII.

131.     Defendant, including Plaintiff's supervisors, knew of Plaintiff's engagement in protected activity prior to engaging in the aforementioned adverse actions when they were informed by staff member in the Inspector General's Office, advised by a Department official, or otherwise should have known that Plaintiff engaged in the complaint process based on her informal and formal complaint filings.

132.     The adverse retaliatory actions to which Plaintiff has been subjected to are a direct result of Plaintiff having previously engaged in statutorily-protected activity.

133.     Plaintiff's prior protected activity was a determining factor in Defendant's unlawful conduct toward Plaintiff.

134.     Plaintiff's prior protected activity was a motivating factor in Defendant's unlawful conduct toward Plaintiff.

135.     Similarly situated employees (no known prior EEOC activity) were not subjected to the same, similar, or any adverse treatment.

136.     Defendant's unlawful conduct has created a climate of fear and isolation for Plaintiff and other employees, which created a chilling effect in violation of Title VII.

137.     The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

138.     Defendant's unlawful conduct negatively impacted the terms, conditions and privileges of Plaintiff's employment.

139.     Defendant's retaliatory conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of his participation and opposition to Defendant's discriminatory conduct.

140.     Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

141.     As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary damages - including but not limited to past and future loss of income, benefits, career opportunities, medical expenses and costs - and is entitled to all available legal and equitable remedies.

142.     Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and her injury is permanent in nature. Further, Defendant's treatment and actions were ongoing.

143.     Plaintiff has incurred lost wages, loss of reputation, defamation of character, and loss of career opportunity now and into the future, and all of the other losses stated with Plaintiff contributing in any way thereto.

144.     The Baltimore City Police Department must comply with Title VII, and by and through their conduct, violated the law.

145.     The reasons proffered by Defendant for their unlawful conduct are pretextual and Defendants cannot offer any legitimate reason for their unlawful conduct.

146.     Defendant is directly liable for the discriminatory acts or omissions of its employees while acting within the court and scope of their employment, under the theory of *Respondeat Superior*.

147.     Defendant's actions were intentional, reckless, and malicious.

148.     As a direct and proximate cause of Defendant's conduct alleged throughout this complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages—including but not limited to past and future loss of income, benefits, and career opportunities—and is entitles to all available legal and equitable remedies.

149.     Plaintiff was humiliated, embarrassed, and made to ensure a great amount of pain and suffering. Plaintiff's injury is permanent in nature. Further, Defendant's actions were ongoing.

150.     Plaintiff has incurred lost wages, loss of reputation, defamation of character now and into the future, and all of the other losses stated with Plaintiff not contributing in any way thereto.

## COUNT V

### VIOLATION OF SECTION 1981

151.     Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

152.     As an African American, Plaintiff is a member of a protected class.

153.     Because of her race (African American), Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint under Section 1981.

154.     Defendant's foregoing unlawful adverse actions materially affected the terms, privileges, and conditions of Plaintiffs employment.

155.     Defendant knew that Plaintiff is an African American prior to the adverse actions described throughout the Complaint and was aware or should have been aware of the discrimination Plaintiff was subjected to because of her race.

156.     Plaintiff has been treated differently and subjected to different terms and conditions of her employment due to her race (African American).

157.     Defendant has limited, segregated, and classified Plaintiff in a way that deprived her of employment opportunities and otherwise adversely affected her status as an employee, because of her race (African American).

158.     Other employees who were similarly situated, but members of a different class than Plaintiff, have been treated more favorably than Plaintiff in the terms and conditions of employment.

159.     Plaintiff's race was a determining factor in Defendant's unlawful conduct toward Plaintiff.

160.     The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

161.     Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her race (African American).

## COUNT VI

**VIOLATION OF THE MARYLAND FAIR EMPLOYMENT PRACTICES ACT (FEPA)**

162.     Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

163.     The Maryland Fair Employment Practices Act (FEPA), Md. Code Ann., State Gov't, § 20-601 et seq. outlaws discrimination in employment based on race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic information, or disability by employers with more than 15 employees.

164.     Under FEPA, an employer can be held legally responsible if the person responsible for the harassment can make or recommend employment decisions (e.g., hiring and firing, promotion and demotion, and reassignments) or directs, supervises, or evaluates the work activities of the employee, even if that person does not have the power to make employment decisions.   Additionally, an employer can be liable if its own negligence leads to harassment or enables harassment to continue.

165.     Harassment is unwelcome or offensive conduct that is based on "race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, gender identity, or disability."

166.     Here, Plaintiff was subjected to harassment or offensive conduct that is based on race and sex, where she was subjected to an ongoing hostile work environment and harassment, including but not limited to, inappropriate conduct, intimidation, and threats. Plaintiff faced discrimination when she was involuntarily transferred without being provided reasoning for this transfer; when Deputy Commissioner James Gillis requested that her new commanding officer keep an eye on her and fabricate misconduct so that he had substantiation to write her up; and when she was told she qualified for a promotion, applied for and interview for it, and then was denied based upon a proposed policy that was not in effect or enforceable. The above-mentioned actions by Defendant towards Plaintiff demonstrates the discriminatory and prejudicial manner in which Defendant treated Plaintiff and her lawful claims against them.

167.     The Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her race (African American) and sex (female).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Sergeant Welai Grant, respectfully prays that this Court grant her the following relief:

a. Enter a declaratory judgement finding that the foregoing actions of Defendant violated Title VII and Section 1981;

35

b. Enter a permanent injunction directing Defendant to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

c. Award back pay and compensatory damages in the amount of $10,000,000 (ten million dollars and zero cents) that would fully compensate Plaintiff for the economic loss, loss of promotional potential, reputation, lost wages, lost job benefits; physical and psychological injury, humiliation, embarrassment; and mental and emotional distress caused by the conduct of the Defendants alleged herein;

d. Award Plaintiff reasonable attorneys' fees and costs incurred in this action; and

e. Order such other relief as this Court deems just and equitable.


## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable herein.

Dated: August 24, 2021

Respectfully submitted,

Dionna Maria Lewis

_____

Dionna Maria Lewis, Esq.
District Legal Group, PLLC
Bar No. 19486
700 Pennsylvania Ave, SE, Suite 2098
Washington, D.C. 20003
Phone: (202) 486-3478
Dionna@DistrictLegalGroup.com


*Counsel for Plaintiff Welai Grant*