IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| WELAI GRANT, | * | |
| *Plaintiff*, | * | |
| v. | * | |
| BALTIMORE CITY POLICE | * | Civil Action No. RDB-21-2173 |
| DEPARTMENT, | * | |
| *Defendant*. | * | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION

Plaintiff Welai Grant, a Police Sergeant for the Baltimore City Police Department ("BPD"), brings this suit for retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e., against her employer. After Grant filed a complaint against a colleague, she was involuntarily transferred to another department. Since her complaint, she has been denied promotion and transfer requests, received an absent without leave ("AWOL") charge, and been ordered to take a fitness-for-duty evaluation. She claims these events occurred in retaliation for her complaint against her colleague.

Presently pending is BPD's Motion for Summary Judgment. (ECF No. 43.) In support of its motion, BPD argues that Sergeant Grant has not made a prima facie case for retaliation because there were no adverse employment actions taken against her and because she cannot demonstrate a connection between the purported adverse employment actions and her protected activity of filing EEOC and/or Internal Affairs complaints. BPD further argues that it had legitimate reasons for the purported adverse employment actions. The parties'

submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2023). For the reasons set forth below, BPD's Motion for Summary Judgment is GRANTED. There are no genuine issues of material fact with respect to whether Grant was the victim of intentional discrimination. The Baltimore City Police Department is entitled to judgment as a matter of law.

## BACKGROUND

In ruling on a motion for summary judgment, this Court reviews the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *see also Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 433 (4th Cir. 2013). This Court has recounted the facts alleged in the Complaint in its previous Memorandum Order (ECF No. 14) and Memorandum Opinion (ECF No. 27) which ruled on Defendants' then-pending Motions to Dismiss. (ECF Nos. 7, 21.) Given the differing procedural posture, the Court will briefly summarize and supplement facts where necessary.

Plaintiff Welai Grant is an African American female Police Sergeant for the Baltimore City Police Department ("BPD"), where she has worked since 2008. (ECF No. 20 at 4.) Sergeant Grant was assigned to the Recruitment Section in August 2018. (*Id.*) In September 2018, Grant filed a complaint against James Handley,[1] a white male BPD Major, triggering an investigation into Major Handley by the BPD Internal Affairs Ethics Unit. (*Id.* at 4–5.) Major Handley questioned Sergeant Grant about the complaint and intimidated her by alluding to

---

[1] Major Handley retired from the BPD on May 1, 2020. (ECF No. 48 at 38.) At the time of his retirement, he remained under investigation by the Internal Affairs Department regarding his alleged use of a racial slur in reference to a BPD applicant. (*Id.* at 17.) He retired before the investigation concluded. (*Id.* at 38.)

"friends in high places." (*Id.* at 5.) Major Handley was ultimately assigned to the Recruitment section as Acting Major of Recruitment in July 2019. (*Id.* at 8.) That same month, he warned Sergeant Grant that he would retaliate against anyone who made a statement against him. (*Id.*) On August 1, 2019, Sergeant Grant witnessed Major Handley use a racial slur in reference to a BPD applicant. (*Id.*) Sergeant Grant immediately filed a formal complaint regarding the incident with the Inspector General's Office. (*Id.* at 8–9.)

On August 7, 2019, Sergeant Grant met with BPD Deputy Commissioner James Gillis at his request. (*Id.* at 9.) During that meeting, Deputy Commissioner Gillis informed Sergeant Grant that he was aware of the incident involving Major Handley, but Sergeant Grant stated that she did not feel comfortable discussing the matter. (*Id.* at 10.) BPD Commissioner Michael Harrison then entered the room, and Deputy Commissioner Gillis exited. (*Id.*) Commissioner Harrison stated that he wanted to discuss Major Handley, but Sergeant Grant again stated that she did not feel comfortable doing so because she feared retaliation. (*Id.*) Commissioner Harrison stated that those fears were unnecessary, as Deputy Commissioner Gillis's exit was intended to help her feel more comfortable. (*Id.*) He then asked whether Sergeant Grant filed a complaint with the Inspector General's office. (*Id.* at 10–11.) Sergeant Grant confirmed that she had done so, but she requested to keep their conversation confidential. (*Id.* at 11.)

Two weeks later, Major Handley allegedly became increasingly antagonistic toward Sergeant Grant and made negative remarks about her to his colleagues. (*Id.* at 12.) That same month, in August 2019, another coworker, Sergeant Regina Richardson, stated that the story involving Major Handley had been fabricated, but Sergeant Grant rebutted this by stating that Sergeant Richardson had not been present for the event. (*Id.* at 13.) Sergeant Grant followed

3

up with an email to Sergeant Richardson, who is African American, in which Sergeant Grant called Sergeant Richardson "selfish" and "brainwashed" and referred to her as "a complete lunatic" and "a white woman trapped in a black woman's body." (ECF No. 48-3 at 20.) Sergeant Richardson forwarded that email to Deputy Commissioner Gillis and other BPD personnel. (ECF No. 20 at 13.)

That same month, in August 2019, Sergeant Grant applied for a position in the Homicide Unit but did not receive the transfer. (*Id.*) She then allegedly became aware that another coworker, Sergeant Kevin Brown, had stated that Sergeant Grant would not be selected because of her previous complaints against Major Handley. (ECF No. 43-7 at 14–15.) Sergeant Grant then filed an Internal Affairs case against Sergeant Richardson and Sergeant Brown for preventing her from consideration for the position in the Homicide Unit. (ECF No. 20 at 14.) The Internal Affairs investigation determined that these allegations were unfounded. (ECF No. 48-6 at 36.)

In September 2019, Sergeant Grant confronted Sergeant Richardson in her office. (ECF No. 48-3 at 7.) A civilian employee was in the office with Sergeant Richardson at the time, but Sergeant Grant asked her to leave. (*Id.*) Sergeant Richardson said that they would both leave together, but Sergeant Grant stood in the doorway, preventing either of them from leaving. (*Id.*) The civilian employee and Sergeant Richardson squeezed past Sergeant Grant and exited the room. (*Id.*) Later that month, Sergeant Grant was detailed to the Special Events Unit. (ECF No. 48-1 at 15.)

In October 2019, the BPD Public Integrity Bureau initiated an investigation into Sergeant Grant based on her email to Sergeant Richardson and the interaction in Sergeant

Richardson's office. (ECF No. 48-3 at 5.) On January 16, 2020, at a meeting regarding the investigation, Sergeant Grant provided a statement about the email. (*Id.* at 7.) She was also ordered by Internal Affairs to provide a statement regarding her second complaint against Major Handley. (ECF No. 20 at 15.) She learned that Sergeant Richardson and Major Handley accused her of being friends with the BPD applicant against whom the slur was used, but this allegation was proven false through an Internal Affairs investigation. (*Id.*) Internal Affairs eventually determined that the allegations against Major Handley were valid, and he retired shortly thereafter. (*Id.* at 15–16.)

In July 2020, Sergeant Richardson's case against Sergeant Grant for Conduct Unbecoming, Inappropriate Comments, and Inappropriate Workplace Conduct was sustained, and Sergeant Grant received a proposed punishment that included a thirteen-day suspension, a letter of reprimand, and required attendance at a workplace violence training seminar. (ECF No. 48-1 at 3; ECF No. 48-3 at 39.)[2] Grant alleges that she decided not to contest the punishment after discussing the proposed punishment with Deputy Commissioner Brian Nadeau, who assured her that it would not affect her promotional opportunities. (ECF No. 20 at 16.) Sergeant Grant applied for a transfer to the Use of Force ("UOF") section and interviewed for the position on August 5, 2020, but was not selected for the position. (ECF No. 51-4 at 14.)

---

[2] Grant asserts that the mandatory workplace violence training was excluded from the disciplinary action because Deputy Commissioner Nadeau allegedly concluded that the training was not mandatory due to the lack of violence at issue. (ECF No. 51-31 at 12.) However, Grant's "Acceptance of Disciplinary Action" form lists workplace violence training under the Disciplinary Determination section. (ECF No. 52-3 at 39.)

In June 2021, Sergeant Grant contacted BPD's Equity Officer, Bill Joyner, to request review of the Promotional Committee's notes to understand how she could improve her chances at promotion. (ECF No. 20 at 17.) Mr. Joyner declined Sergeant Grant's request to review the notes and explained that Sergeant Grant was denied the promotion because she did not meet the qualifications of Draft Policy 1721, which stated that a candidate must be deferred for promotion if the candidate has "[w]ithin the past five years, one (1) or more Sustained complaints of an Egregious or Serious Act of Misconduct." (*Id.* at 18; ECF No. 43-5 at 8.) Sergeant Grant expressed her concern that the stated reasoning was pretextual and that she was denied promotion in retaliation for her complaints against Major Handley. (ECF No. 20 at 19.) Four days later, Sergeant Grant received an Absent Without Leave ("AWOL") notice for failure to attend a shift at the June 20, 2021 Orioles game. (*Id.* at 20.) Grant was scheduled for the game by Lieutenant Dennis Reinhard after her coworker, Sergeant Brian Atwood, was approved for vacation leave, creating a vacancy. (*Id.* at 20–21.) The AWOL charge was not sustained. (ECF No. 48-4 at 6.)

On August 10, 2021, Sergeant Grant's supervisor, Major Milton Corbett, called her in for a meeting with Lieutenant Reinhard. (ECF No. 20 at 21.) Sergeant Grant refused to sit down and expressed that she was tired of being targeted by her unit. (*Id.*) Later that day, she was sent a "Fitness for Duty" Evaluation by Major Ettice Brickus at the request of Major Corbett out of concern for her health. (ECF No. 43-19 at 2.) Sergeant Grant then informed Major Corbett that she would be taking medical leave effective the next day, August 11, 2021, due to anxiety and depression resulting from her work environment. (ECF No. 20 at 22.) She

6

was later involuntarily transferred to the Communication Section in November 2021. (ECF No. 51-4 at 4.)

On May 4, 2020, Grant filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in connection with her involuntary transfer from the Recruitment Section to the Special Events Section. (ECF No. 43-36 at 7.) She was issued a right to sue letter on May 26, 2021. (ECF No. 51-29 at 3.) On August 13, 2021, she filed a second charge of discrimination with the EEOC in connection with her denied promotion opportunities and her fitness-for-duty evaluation. (ECF No. 51-31 at 34.) She received a right to sue letter in connection with that charge on August 18, 2021. (ECF No. 43-36 at 5.) On August 24, 2021, Grant filed a six-count Complaint in this Court on the basis of federal question jurisdiction due to her allegations under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. (ECF No. 1.) On January 10, 2022, the BPD moved to dismiss the complaint (ECF No. 7), which was granted with leave to amend (ECF No. 14). Grant filed a four-count Amended Complaint on May 24, 2022 (ECF No. 15), and the BPD again moved to dismiss on June 7, 2022. (ECF No. 16.) Grant filed a Second Amended Complaint on August 11, 2022 (ECF No. 20), and the BPD once again moved to dismiss. (ECF No. 21.) This Court then dismissed Counts I (hostile work environment), III (Section 1983), and IV (Maryland Fair Employment Practices Act) but denied the motion as to Count II (retaliation). (ECF No. 28.)

On August 7, 2023, BPD filed the presently pending Motion for Summary Judgment. (ECF No. 43.) BPD argues that Sergeant Grant has not made a prima facie case for retaliation because there were no adverse employment actions taken against her and because she cannot demonstrate a connection between the purported adverse employment actions and her

protected activity of filing EEOC and/or Internal Affairs complaints. BPD further argues that it had legitimate, non-retaliatory reasons for the purportedly adverse actions. Sergeant Grant argues that BPD was aware that she engaged in a protected activity, she was subjected to adverse treatment by BPD, and there is a nexus between her protected activity and the adverse actions against her. (ECF No. 51.) Grant further argues that BPD's reasons are pretextual. For the reasons set forth below, Defendant's Motion for Summary Judgment shall be GRANTED.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine dispute over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249. Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences "in the light most favorable to the nonmoving party." *Libertarian Party of Va.*, 718

F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). This Court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that a trial court may not make credibility determinations at the summary judgment stage). Indeed, it is the function of the factfinder to resolve factual disputes, including issues of witness credibility. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866–68 (2014).

## ANALYSIS

"[T]he ultimate question in every employment discrimination case . . . is whether the plaintiff was the victim of intentional discrimination." *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 286 (4th Cir. 2004) (en banc) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 153 (2000)). To avert summary judgment, Grant must either (a) provide direct evidence that discrimination motivated the challenged employment decision; or (b) apply the three-step burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to establish that the employer's proffered reason for the decision was a pretext for unlawful discrimination. *Hill*, 354 F.3d at 284–86; *accord Raytheon Co. v. Hernandez*, 540 U.S. 44, 50–52 (2003). The first method of proof requires "evidence of conduct or statements that both reflect directly on the alleged discriminatory attitude and . . . bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (quoting *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc)). The second method applies "where a plaintiff does not present sufficient direct or circumstantial evidence showing

that an adverse employment action was motivated by intentional discrimination." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Such is the case here.

As the United States Court of Appeals for the Fourth Circuit articulated in *Guessous*, the *McDonnell Douglas* framework requires a three-step analysis:

> (1) the plaintiff must first establish a prima facie case of employment discrimination or retaliation; (2) the burden of production then shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action; (3) the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory or retaliatory.

828 F.3d 208, 206; *accord Jones v. Lowe's Co., Inc.*, 845 F. App'x 205, 213 (4th Cir. 2021); *Spencer v. Virginia St. Univ.*, 919 F.3d 199, 208 (4th Cir. 2019); *Abilt v. CIA*, 848 F.3d 305, 315 (4th Cir. 2017). Additionally, a plaintiff cannot rely solely "on [her] 'own assertions of discrimination'" to establish pretext at the summary judgment stage. *Adam v. Trs. Of Univ. of N.C. Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011). Rather, the plaintiff must set forth specific, admissible evidence to show that the employer's proffered reason is false, and that it is a pretext for discrimination or retaliation. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015) (citing *Jimenez v. Mary Wash. Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)).

Grant claims that her involuntary transfers, AWOL charge, fitness-for-duty evaluation, and denied promotion and transfer opportunities constitute retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, for her complaints against Major Handley. BPD argues that these are not adverse actions and that Grant cannot establish a connection between her complaints against Major Handley and these actions. Moreover, BPD argues these actions were taken for legitimate non-discriminatory reasons. Grant counters that these reasons are

pretextual. Discovery having now been completed, and the plaintiff accorded all favorable inferences, Grant's claim for retaliation cannot survive BPD's motion for summary judgment.

## I.    Prima Facie Case

"To make a prima facie claim of retaliation, a plaintiff must show: (1) that she engaged in protected activity, (2) that the employer took a materially adverse action against her and (3) there is a causal connection between the protected activity and the adverse action." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 195 (4th Cir. 2019).

### A.  Protected Activity

"Complaints raised through internal company procedures are recognized as protected activity." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 122 (4th Cir. 2021). BPD does not dispute that Grant engaged in a protected activity by filing a complaint through the Inspector General's office. (ECF No. 57 at 2.) Grant has therefore established a protected activity.

### B.  Adverse Employment Action

"An adverse employment action is a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *Roberts v. Glenn Indus. Grp.*, Inc., 998 F.3d 111, 122 (4th Cir. 2021) (alteration in original) (quoting *Chang Lim v. Azar*, 310 F. Supp. 3d 588, 601 (D. Md. 2018)). Grant argues "that her reassignments and denied transfer requests were adverse, retaliatory actions." (ECF No. 51-1 at 6–7.) She further argues that "[d]ue to her reassignments, Plaintiff was unable to work overtime in her Unit, thereby detrimentally affecting her pay." (*Id.* at 7.) According to Grant, "working overtime through the Secondary Employment Unit is . . . a far more burdensome process, which deterred her from seeking overtime assignments after her transfers. . . . As a result, Plaintiff experienced a

11

decrease in her annual salary." (*Id.*) Grant also argues that her transfer from Recruitment to Special Events removed her "supervisory duties whereas she had previously supervised ten detectives." (*Id.*) Moreover, Grant argues that the personnel action brought against her by Sergeant Richardson, the AWOL investigation instigated by Lieutenant Reinhard, and the fitness-for-duty evaluation were all adverse actions. (*Id.* at 8.)

In response, BPD points to Grant's failure to file a grievance under the Memorandum of Understanding between BPD and the Fraternal Order of Police contesting the transfers, which BPD asserts amounts to a failure to exhaust administrative remedies. (ECF No. 43-2 at 4.) BPD also argues that Grant failed to produce any evidence as to an extra burden in securing overtime in her new position, and it refutes her claim that she does not have supervisory duties in her new assignment because she stated at her deposition that she is in charge of the KGA (police dispatch) supervisor. (ECF No. 57 at 3–4; ECF No. 51-31 at 23.) Moreover, BPD claims the denied transfers are not adverse actions because they amount to lateral moves, and "[e]mployees are not entitled to the assignment of their choosing." (ECF No. 57 at 5.) Neither, BPD claims, is the AWOL charge an adverse action, as stated in this Court's Memorandum Opinion in *Wonasue v. Univ. of Maryland Alumni Ass'n*, 984 F. Supp. 2d 480 (D. Md. 2013) ("[N]one of the following constitutes an adverse action in a retaliation claim: . . . considering the employee 'AWOL' . . . ."). (ECF No. 57 at 5.) Lastly, BPD claims there is no evidence suggesting that a fitness-for-duty evaluation constitutes an adverse employment action. (ECF No. 57 at 6.)

The Supreme Court has recently heard oral argument regarding whether a lateral transfer constitutes an adverse action, so this aspect of the framework remains a developing

piece of the law. *See Muldrow v. City of St. Louis, Missouri*, 142 S. Ct. 2686 (2023). Nevertheless, the record reflects that Grant received less pay after the transfers. (ECF No. 51-18.) This provides sufficient evidence for a reasonable juror to find that Grant suffered an adverse action, regardless of the outcome of *Muldrow*.

### C. Causation

"[E]stablishing a 'causal relationship' at the prima facie stage is not an onerous burden." *Smith v. CSRA*, 12 F.4th 396, 417 (4th Cir. 2021) (quoting *Strothers v. City of Laurel*, 895 F.3d 317, 335 (4th Cir. 2018)). The three methods for proving causation in a retaliation case are (1) establishing facts supporting causation through relevant evidence, (2) demonstrating sufficient temporal proximity between the adverse action and the protected activity, or (3) some combination thereof. *Roberts*, 998 F.3d at 123. The United States Court of Appeals for the Fourth Circuit has "consistently required proof of a decisionmaker's knowledge of protected activity to support a Title VII retaliation claim." *Id.* at 124. "Knowledge of a protected activity means not only knowledge that the activity occurred, but also knowledge that the employee engaged in the protected activity *because* the employee had a reasonable belief that a Title VII violation occurred." *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 412 (4th Cir. 2022) (citation omitted).

As a preliminary matter, as Judge Hollander of this Court has noted, "when the employer proffers evidence of a legitimate reason for its adverse action in its motion for summary judgment, the Fourth Circuit has assumed, without deciding, that the plaintiff established a prima facie case." *Allen v. Baltimore Cnty. Bd. of Educ.*, No. CV ELH-21-1006, 2023 WL 5352416, at *12 (D. Md. Aug. 21, 2023) (collecting cases). Such is the case here. Regardless

13

of Defendant's rebuttal, however, Grant's EEOC complaint is clearly noted on her promotional candidate employee information report (ECF No. 51-1), so Defendant's arguments as to lack of knowledge are unavailing as to Plaintiff's prima facie case. The notation of Grant's EEOC complaint on her promotional candidate employee information report establishes that BPD "either understood or should have understood the employee to be engaged in protected activity." *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 335–36 (4th Cir. 2018). Given the low bar to make a prima facie case for retaliation, Grant survives the first step of the *McDonnell Douglas* framework.

## II.     Defendant's Rebuttal

In rebuttal, BPD cites Policy 1721, Policy 1738, and Paragraph 432 of the Consent Decree and claims that Sergeant "Grant was not promoted because of her egregious and serious workplace misconduct." (ECF No. 43-2 at 27.) According to BPD, "both the Consent Decree and BPD policy dictate that an employee's disciplinary history must be considered in determining whether a candidate should be promoted." (ECF No. 57 at 8.) BPD claims that Grant "was considered for promotion after she had accepted punishment for an incident involving a civilian and another sergeant, which required workplace violence training." (*Id.*) This punishment, BPD claims, caused her denial of promotional and transfer opportunities.

Additionally, BPD asserts that Sergeant Grant was transferred from Recruitment to Special Events for personnel reasons after Major Handley "separated from the BPD." (ECF No. 43-2 at 27.) BPD also argues that "[t]he November 2021 transfer to Communications post-dates the filing of the charges of discrimination and should not be considered[.]" (*Id.* at 27–28.) Lastly, BPD asserts that Sergeant Grant "was not offered positions at Homicide or

UOF, not for retaliatory reasons, but because other candidates were better suited to the work of those units." (*Id.* at 26.)

This, BPD argues, provides a legitimate, non-retaliatory reason for the alleged adverse actions against Grant. When evaluating whether an employer has articulated a legitimate, non-retaliatory reason for its actions, "this Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." *DeJarnette v. Corning, Inc.,* 133 F.3d 293, 298–99 (4th Cir. 1998); *Staley v. Guenberg,* No. 13-1875, 575 F. App'x. 153, 156 (4th Cir. June 6, 2014). Thus, "it is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the [employment decision]." *Villa v. CavaMezze Grill, LLC,* 858 F.3d 896, 901 (4th Cir. 2017) (quoting *DeJarnette,* 133 F.3d at 299). Therefore, because BPD has put forth legitimate, non-retaliatory reasons for its actions, the burden shifts back to Grant to demonstrate that BPD's purported reasons are pretextual.

### III.   Pretext Analysis

To establish pretext at the summary judgment stage, a plaintiff may either show that the employer's stated justification is "unworthy of credence," or offer additional circumstantial evidence of discrimination. *Mereish v. Walker,* 359 F.3d 330, 336 (4th Cir. 2004) (quoting *Texas Dep't of Cnty. Affairs v. Burdine,* 450 U.S. 248, 256 (1981)). A plaintiff cannot rely solely "on [her] 'own assertions of discrimination'" to establish pretext at the summary judgment stage. *Adams v. Trs. of Univ. of N.C.-Wilmington,* 640 F.3d 550, 560 (4th Cir. 2011) (quoting *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 456 (4th Cir. 1989)). Rather, the plaintiff must set forth specific, admissible evidence to show that the employer's proffered reason is false, and that it is

a pretext for discrimination or retaliation. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015) (citing *Jimenez v. Mary Wash. Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)). In other words, the plaintiff must "prove 'both that the reason was false, and that discrimination was the real reason.'" *Adams*, 640 F.3d at 560 (quoting *Jimenez*, 57 F.3d at 378).

Grant's chief pretext argument is that BPD fails to assert a legitimate, non-discriminatory reason for its actions. (ECF No. 51-1 at 11.) As noted above, however, BPD has in fact done so, and Grant even states the reasons in her Memorandum in Opposition: "namely that there were operational needs for her transfers, that other candidates were more qualified for selection than Plaintiff, and that BPD policy and the Consent Decree prevented Plaintiff from being selected for promotion due to her disciplinary record[.]" (*Id.* at 13.) Grant therefore undercuts her own argument as to pretext. Nevertheless, as Judge Hollander of this Court has noted, "the prima facie case and pretext analysis collapse into a single analysis." *Jennings v. Frostburg State Univ.*, No. CV ELH-21-656, 2023 WL 4567976, at *18 (D. Md. June 27, 2023). But even looking to Grant's arguments as to her prima facie case, she has not demonstrated that BPD's reasons are pretextual.

The record reflects that the members of the BPD promotion committee chose not to recommend Sergeant Grant for promotion due to her disciplinary record. (ECF Nos. 48-7, 48-8, 48-10, 48-11, 48-12, 48-13.) The record also reflects all candidates considered for promotion from Sergeant to Lieutenant were evaluated under draft Policy 1721, including Sergeant Grant. (*Id.*) And even though Grant's EEOC complaint was listed on her Lieutenant Promotional Candidate Employee Information form, the promotion committee was not provided with cases or investigations in which the candidate was a complainant. (*Id.*)

Moreover, the members of the BPD promotion committee are consistent in their affirmations that they were not aware that Sergeant Grant had any complaints against Major Handley, and even if they had been, they would not have factored it into their decisions as dictated by Policy 1721, Policy 1738, and Paragraph 432 of the Consent Decree. (*Id.*) The members of the promotion committee further agree that no one asked them to not recommend Sergeant Grant for promotion because of any internal affairs complaint. (*Id.*) Grant, conversely, cites only to her own testimony and self-serving statements, which alone are insufficient to create a genuine issue of material fact. *See Cole v. Washington Grp. Int'l, Inc.*, No. CV RWT 06-2557, 2008 WL 11509726, at *3 (D. Md. Mar. 14, 2008) ("If summary judgment is to serve any purpose, a plaintiff in a discrimination suit cannot be allowed to trudge onward to trial by merely asserting, without offering any specific facts, that a defendant stated that he was taking an adverse employment action because of a discriminatory motive."). The record therefore consistently reflects that Grant's promotion was not denied for any retaliatory purpose.

Regarding Grant's denied transfer requests and reassignments, the record reflects that her detail out of the Recruitment Unit was in support of personnel needs and resulted from her hostile behavior. (ECF No. 48-3 at 60.) Grant's failure to contest this transfer, as well as her later transfer to the Communications Unit, through BPD's internal processes only further underscores Grant's inability to discredit the legitimacy of the decisions. (ECF No. 43-6 at 39.) Although Grant argues that the Special Events Unit was already overstaffed, the evidence she cites indicates only that BPD should consider having civilians assume more duties to free sworn personnel for other needs. (ECF No. 51-16 at 5.) The record further reflects that Grant's medical provider requested that Grant transfer out of the Special Events Unit, which

later occurred. (ECF No. 48-5 at 2.) Grant has produced no evidence other than her own assertions, save one anonymous email, that indicate that her transfer requests were denied for any reason besides the BPD's purported reasoning, which provides that other candidates were better suited to the work of those units. (ECF No. 43-26 at 2.) In fact, an internal investigation found that Grant's allegations that she was "blackballed" were unfounded. (ECF No. 48-6 at 36.) In sum, the record reflects nothing to suggest that BPD's reasoning for Grant's denied transfer requests and reassignments, namely that the decisions supported personnel needs and identified the best candidates for each position, is pretextual.

Lastly, the fitness-for-duty evaluation, which is unlikely to be an adverse action in any event, was clearly supported by concerns for Sergeant Grant's mental health and well-being. (ECF No. 43-19 at 2.) And neither can an unsustained AWOL charge create a genuine issue of material fact in this case. (ECF No. 48-4 at 6.) Grant has therefore produced no record evidence causing any reason to doubt BPD's purported reasons, and Grant can point to no shift in BPD's reasoning that would give rise to an any inference of discrimination. *See Chung Shin v. Shalala*, 166 F. Supp. 2d 373, 375 (D. Md. 2001) ("While the evidence of the non-movant is to be believed and all justifiable inferences drawn in its favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences.").

In this case, there is simply nothing close to "proof that the employer's explanation is false." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 149 (2000). Even viewing the facts in a light most favorable to Grant, she makes no showing that BPD's explanations are "unworthy of credence," nor does she provide "other forms of circumstantial evidence sufficiently probative of" retaliation. *See Mereish v. Walker*, 359 F.3d 330, 332 (4th Cir. 2004).

No reasonable juror could determine that Grant's complaints caused a negative difference in the outcome of her applications for promotion and transfer, and neither did her complaints impact her involuntary transfers, AWOL charge, or fitness-for-duty evaluation. Although Sergeant Grant's complaint against Major Handley may have been the source of her disagreement with Sergeant Richardson, it was Sergeant Grant's treatment of Sergeant Richardson that ultimately hindered her opportunities for promotion and transfer. There can thus be no genuine dispute of material fact that allows Grant's claim to survive summary judgment. Accordingly, BPD's Motion for Summary Judgment (ECF No. 43) is GRANTED.

## CONCLUSION

For the foregoing reasons, BPD's Motion for Summary Judgment (ECF No. 43) is hereby GRANTED, and Judgment is entered in its favor.

A separate order follows.

Date: February 1, 2024

_____ /s/ _____

Richard D. Bennett
United States Senior District Judge